IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| ROBERT LANGDON, II, | ) | CIVIL ACTION NO. 9:14-4424-JMC-BM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner wherein he was denied disability benefits. This case was referred to the undersigned for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), (D.S.C.).

Plaintiff applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI)[1] on September 2, 2011, alleging disability as of July 16, 2011 due to a bi-polar disorder, left ankle injury, lower back pain, asthma, headaches, no sense of smell, high cholesterol, depression, anxiety, temper/anger issues, and short term memory problems. (R.pp. 26, 193-200, 218). Plaintiff's claims were denied both initially and upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), which was held on November 19, 2013. (R.pp.

---

[1]Although the definition of disability is the same under both DIB and SSI; Emberlin v. Astrue, No. 06-4136, 2008 WL 565185, at * 1 n. 3 (D.S.D. Feb. 29, 2008); "[a]n applicant who cannot establish that [he] was disabled during the insured period for DIB may still receive SSI benefits if [he] can establish that [he] is disabled and has limited means." Sienkiewicz v. Barnhart, No. 04-1542, 2005 WL 83841, at ** 3 (7th Cir. Jan. 6, 2005). See also Splude v. Apfel, 165 F.3d 85, 87 (1st Cir. 1999)[Discussing the difference between DIB and SSI benefits].



…

58-91). The ALJ thereafter denied Plaintiff's claims in a decision issued January 31, 2014. (R.pp. 26-52). The Appeals Council denied Plaintiff's request for a review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. (R.pp. 1-8).

Plaintiff then filed this action in United States District Court. Plaintiff asserts that there is not substantial evidence to support the ALJ's decision, and that the decision should be reversed and remanded for further consideration, or for an outright award of benefits. The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that Plaintiff was properly found not to be disabled.

**Scope of review**

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Richardson v. Califano, 574 F.2d 802, 803 (4th Cir. 1978); Myers v. Califano, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

Hays, 907 F.2d at 1456 (citing Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966)); see also, Hepp v. Astrue, 511 F.3d 798, 806 (8th cir. 2008)[Noting that the substantial evidence standard is "less demanding than the preponderance of the evidence standard"].



The Court lacks the authority to substitute its own judgment for that of the Commissioner. Laws, 368 F.2d at 642.  "[T]he language of [405(g)] precludes a de novo judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by substantial evidence." Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

### Discussion

A review of the record shows that Plaintiff, who was thirty-two (32) years old on the date he alleges he became disabled, has a high school education with past relevant work experience as a collector and security guard.  (R.pp. 26, 50, 64, 85-86, 219).  In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that he has an impairment or combination of impairments which prevent him from engaging in all substantial gainful activity for which he is qualified by his age, education, experience and functional capacity, and which has lasted or could reasonably be expected to last for at least twelve (12) consecutive months.  After a review of the evidence and testimony in this case, the ALJ determined that, although Plaintiff does suffer from the "severe" impairments[2] of residuals of lower extremity fractures, obesity, asthma, depressive disorder, personality disorder, anxiety disorder, and impulse control disorder, thereby rendering him unable to perform either of his past relevant jobs (both of which were semi-skilled and required contact with the public), he nevertheless retained the residual functional capacity (RFC) to perform a restricted range of medium work,[3] and was therefore not

---

[2]An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521(a); Bowen v. Yuckert, 482 U.S. 137, 140-142 (1987).

[3]Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying
(continued...)



entitled to disability benefits.  (R.pp. 28, 39, 50-51).

Plaintiff asserts that in reaching his decision, the ALJ erred by improperly evaluating and rejecting the opinions of Plaintiff's treating physician (Dr. Karen Minner) and Nurse Practictioner (Jerome Mega).  However, after a careful review and consideration of the evidence and arguments presented, the undersigned finds and concludes for the reasons set forth hereinbelow that there is substantial evidence to support the decision of the Commissioner, and that the decision should therefore be affirmed.  Laws, 368 F.2d 640 [Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion"].

## I.

### (Medical Evidence)

Plaintiff's medical records confirm that he has a long history of complaints of mixed anxiety and depression as well as impulse and mood control problems due to a traumatic brain injury suffered when Plaintiff fell out of a truck in 2001.  (R.pp. 395, 764, 777).  Eight (8) years after this accident, a CT scan of Plaintiff's brain performed on January 7, 2009 confirmed that Plaintiff had encephalomalacia involving the bilateral frontal lobes and left temple lobe as well as ethmoid air cell disease.  (R.pp. 583-584).  An examination performed by Dr. Jay Ginsberg with the Veteran's Administration on August 18, 2009 noted that, following a mental health consult in September 2008, Plaintiff had been diagnosed with impulse control disorder, adjustment disorder with mixed anxiety and depression, and mood disorder due to his traumatic brain injury.  Plaintiff told Dr. Ginsberg that he had anger problems which would cause him problems at work, but that otherwise he had

---

[3](...continued)
of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c).



experienced very little loss of interest in his leisure activities, he liked to "chat online" as well as do karaoke and play softball, that he got together with friends and went out to socialize, and attended church. Dr. Ginsberg noted that Plaintiff was employed at that time as a loan company manager and did not have any significant problems at work.

On examination Dr. Ginsberg noted elevations of several personality scale indicators including antisocial and aggressive traits as well as histrionics, with Plaintiff's assessment indicating the presence of anxiety, bipolar mania, and suggestions of thought disorder. Although Plaintiff denied current and past alcohol and other substance abuse, Dr. Ginsberg nonetheless opined that alcohol dependance was also a consideration in Plaintiff's condition. Plaintiff's overall information processing assessment scores fell into the mild impairment range. Dr. Ginsberg concluded that Plaintiff had some mild cognitive deficits relating to working memory and information processing, which was essentially a frontal lobe pattern of memory deficit. Basic memory function appeared to be intact, with the overall severity of Plaintiff's information process and deficit appearing to be "mild". Dr. Ginsberg further opined that the evidence supported problems with personality and emotional adjustment characterized by high levels of anxiety and manic-like behaviors on occasion, especially when Plaintiff was under stress. Dr. Ginsberg suggested some "compensatory strategies" to improve Plaintiff's "mild impairment in working memory", such as the use of calculators or other devices to assist Plaintiff with information processing. (R.pp. 776-778).

Plaintiff's medical records reflect that, at some point after Ginsberg's assessment, Plaintiff stopped going to the VA for any mental health treatment. See (R.pp. 376, 636-637). Further, notwithstanding Plaintiff's history of mental health issues, it is clear in the record that Plaintiff continued to work full time following his brain injury in 2001; see (R.p. 219); and Plaintiff



does not himself contend that his condition was disabling during this time period. Therefore, in order to obtain DIB, Plaintiff must show that his condition significantly worsened after July 16, 2011 (his alleged disability onset date) from what it had been previously in order to obtain disability benefits. Cf. Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) [absent showing of significant worsening of condition, ability to work with impairment detracts from finding of disability]. However, Plaintiff's medical records do not document any significant worsening of the effects of his traumatic brain injury at the time he alleges he became disabled. Indeed, the record reflects that shortly before the date on which Plaintiff alleges he became disabled (July 16, 2011), he had voluntarily quit his job. (R.pp. 65-66, 636). The genesis of Plaintiff's disability claim is instead related to a physical injury he incurred shortly after he quit his job.

Specifically, about a week after Plaintiff quit his job, he was involved in a motor vehicle accident on July 16, 2011 (his alleged disability onset date) in which he suffered a fracture of his left leg. (R.p. 295). Plaintiff went to the ER, where his systems were reviewed by Dr. Bridget Brennan, the emergency room physician. Notably, with respect to any existing mental issues, Dr. Brennan noted under "psychiatric" that Plaintiff was "negative for anxiety and depression" at that time, although he appeared anxious. (R.pp. 295-296). Plaintiff was also negative for any back pain or neck pain, and he had full range of motion. Plaintiff was positive for leg/ankle swelling, and he was admitted to the hospital where he was diagnosed with a left tibial plafond fracture.[4] Plaintiff underwent irrigation and debridement and application of external fixator performed by Dr John Murray, and was discharged home with instructions for strict non-weight bearing and to call with

---

[4]Plaintiff also had a secondary diagnosis of asthma, with this condition noted as being "stable".

6



any signs of infection. (R.pp. 291-293).

Plaintiff was thereafter reevaluated by Dr. Murray on July 22, 2011, at which time his incision and pin cites were "healing nicely". Even so, Plaintiff was advised that he was going to need open reduction and internal fixation of both the tibia and fibula, and he was referred to Dr. William Richmond for this procedure. (R.p. 381). Dr. Richmond thereafter performed foot surgery on August 8, 2011, following which Plaintiff was discharged home on August 10, 2011, at which time he was "ambulating well with a walker and had good pain control with oral pain medications". Plaintiff was to follow-up with Dr. Richmond on August 25, 2011, and in the meantime continue with "strict non-weight bearing left". (R.p. 322); see also (R.pp. 323-325).

On August 23, 2011 Plaintiff went to the VA emergency room with a "non-urgent complaint" of left foot pain. Plaintiff advised the emergency room personnel that he had previously undergone an operation in which he had had "metal plates put in", and that he had recently "accidently stepped on [his] left foot" and was now having "unbearable pain". Plaintiff was advised to take Percocet for pain relief and to keep his ankle elevated. (R.pp. 752-753).

Plaintiff thereafter had his follow-up visit with Dr. Richmond on August 25, 2011, at which time Plaintiff had "no complaints" and his left lower extremity incisions were found to be "healing nicely along the pin cites with no signs of infection". Plaintiff's sutures were removed, and he was provided with a short leg non-walking cast. Plaintiff was to continue with strict non-weight bearing in his left lower extremity, and return in five weeks. (R.pp. 379). When Plaintiff returned to see Dr. Richmond on September 15, 2011, Dr. Richmond noted that Plaintiff had gone to the emergency room the previous night complaining of "some increased pain and swelling of is left leg inside the cast". However, when Dr. Richmond removed Plaintiff's left lower extremity cast, he



noted only "minimal swelling" with no signs of infection. Plaintiff was instructed to continue taking his "current antibiotics", and he was converted over to a cam walking boot. (R.p. 378).

On October 13, 2011, Dr. Richmond noted that Plaintiff was "not having any complications or side effects from the antibiotics [for his pin tract infection, which was "doing very well"], while on examination his left ankle was found to have five degrees dorsiflexion with thirty degrees of plantarflexion, no tenderness to palpation in the lower leg, and no erythema. Plaintiff's pin cites had "healed nicely". Dr. Richmond advised Plaintiff that he could begin to "wean out" of the cam walking boot into a regular cushioned athletic type shoe, and that he should continue weight bearing as tolerated on the left lower extremity. (R.p. 377).

On November 28, 2011 Plaintiff was seen at the VA with complaints relating to the cellulitis in his left leg, for which he was receiving antibiotics. Plaintiff complained that he was suffering from swelling and drainage from a small area on his left lower leg where the "fixator" was applied, which Plaintiff complained had not been responsive to antibiotics. Plaintiff was diagnosed with probable osteomyelitis of the left tibia. Plaintiff had an x-ray taken, which showed that his orthopedic hardware was intact, although there was a focal small radiolucent zone which was "probably uncomplicated cites of former screws". The code entry indicated that this was an abnormality that needed attention. (R.pp. 486-487, 744-745).

Plaintiff then returned to see Dr. Richmond on December 15, 2011, where it was noted that Plaintiff's cellulitis around the pin cites postoperatively had "responded well" to antibiotics, and that although Plaintiff had "some occasional pain" he was currently weight bearing as tolerated in a cushioned athletic-type shoe and reported overall that his leg was doing better. Dr. Richmond noted that radiographs of the left ankle showed that Plaintiff's fractures appeared to be



healed and in good alignment, that all hardware was intact and in good position, and that Plaintiff's mortise was intact. On examination Plaintiff's left ankle had five degrees of dorsiflexion with thirty degrees of plantarflexion, no tenderness to palpation of the fracture cites, no erythema, and only some "mild diffuse swelling". Dr. Richmond opined that the cellulitis in Plaintiff's left leg was "improved", and that his post-op condition was "stable". Plaintiff was advised to continue standing and walking activities as tolerated with cushioned athletic-type shoes, but to avoid running or jumping activities. (R.p. 538).

With respect to Plaintiff's previously existing brain injury from 2001, on December 19, 2011 (which was five (5) months after Plaintiff alleges he became disabled following his leg injury) Plaintiff had a consultative mental status examination performed by Dr. Robert Phillips on referral from the South Carolina Department of Vocational Rehabilitation. It was noted that Plaintiff drove himself to the assessment and had a normal appearance. Plaintiff complained to Dr. Phillips that ever since the truck accident in 2001, he suffered from "reduced" or "inconsistent" memory, that he could get very "snappy", and that he had problems in relationships and in employment due to his quick temper. Even so, it was noted that Plaintiff was taking no psychotrophic medication for this condition, and had not been hospitalized. Plaintiff also told Dr. Phillips that he suffered from ankle pain as a result of his vehicle accident. Socially, Plaintiff reported that he had some friends and visited with family, but that it was "difficult for him to get along with other[s] at this time". He also said he had no history of drug or alcohol abuse. Plaintiff reported that his typical daily activities included drinking coffee, playing games, helping his wife and watching TV; that he was able to drive, do household chores, prepare meals, go shopping, manage his finances (poorly), care for young children, and manage his personal care. Plaintiff told Dr. Phillips that he had a "poor ability"



to work without pain, and that his "impulsive temper and impulsive actions" also prevented him from working.

       In assessing Plaintiff's mental status, Dr. Phillips noted that Plaintiff's presentation was "open", that he did not appear to be overly agitated or highly anxious, that he was able to relate well to the physician, that he was well oriented, showed no unusual psychomotor activity, that his communication skills appeared to be good, his thought processes appeared to be normal, his short term memory appeared to be fairly good, his long term memory appeared to be fair, his ability to concentrate during the interview was fairly good, his behavior was cooperative, and there were no indications of delusions or hallucinations. Dr. Phillips did note that Plaintiff's affect was "somewhat tense", and estimated Plaintiff's IQ to be in the "low average range". Dr. Phillips further noted that Plaintiff was able to attend generally well during the exam, and opined that while he had some problems with anxiety, he should be able to focus during and complete simple tasks.

       Dr. Phillips further opined that while Plaintiff's level of pain could make it somewhat difficult for him to be reliable in his effort while at work, his memory appeared to be at least fairly good, and that the extent of disability as described by the Plaintiff "was only partially substantiated as he appeared able to follow directions and communicate well and process information well". Plaintiff placed in the "normal range" on the Folstein Mini-Mental State Exam,[5] his mental awareness appeared to be good, and he was able to follow simple directions and to read and complete a simple written task. Dr. Phillips concluded his report by noting that Plaintiff had no actual

---

[5]The Mini Mental State Examination (MMSE) is a tool used to assess mental status. It is an 11-question measure that tests five areas of cognitive function: orientation, registration, attention and calculation, recall, and language.  http://medical-dictionary.thefreedictionary.com/Mini-Mental+State+Examination, 2012.



symptoms of a bi-polar disorder, and while Plaintiff did not appear to be malingering, Dr. Phillips believed he "may have been embellishing his symptoms to a moderate degree". He diagnosed Plaintiff with generalized anxiety disorder, impulse control disorder and cognitive disorder, not otherwise specified, with a mild impairment in cognitive functioning. (R.pp. 395-398).

On January 5, 2012, Plaintiff's medical records were reviewed by state agency physician Dr. Elva Stinson. Dr. Stinson completed a physical capacities report in which she opined that Plaintiff had the RFC for medium work with the ability to stand and/or walk (with normal breaks) for a total of about six hours in an eight hour work day, sit (with normal breaks) for a total of about six hours in an eight hour work day, that he had an unlimited ability to push and/or pull within the exertional capacity for medium work; that he had no manipulative, visual or communicative limitations; that he could frequently perform all postural activities, but that he should avoid concentrated exposure to environmental hazards such as fumes, gases and poor ventilation (as a result of Plaintiff's asthma), and all exposure to hazards such as machinery and heights. As part of her evaluation Dr. Stinson noted that Plaintiff was now full weight bearing and no longer wearing the walking boot, and that he had reported that he was able to walk one-fourth of a mile, climb one flight of stairs, and drive a car without special accommodations. (R.pp. 118-120). Thereafter, on January 10, 2012, state agency physician Dr. Kevin King completed a report relating to Plaintiff's mental impairment in which he found that Plaintiff's organic mental disorders, affective disorders, and personality disorders had resulted in only a mild restriction in Plaintiff's activities of daily living and with respect to maintaining concentration, persistence or pace, and a moderate limitation in his social functioning. (R.pp. 111-117).

Plaintiff's medical records show that in early 2012 Plaintiff was seen at the VA for



consultations relating to his leg injury and complaints of recurrent drainage and pain from the pin site. Plaintiff complained on January 13, 2012 that he was experiencing pain at a level of four on a ten point pain scale, and he was referred for a consult for antibiotic recommendations post-surgery. (R.pp. 738-741). On February 8, 2012, Dr. John Chu removed cultures from the bone hole and the area was debrided with no grossly purulent material being encountered. The plan was for Plaintiff to receive antibiotic therapy as needed/indicated once the cultures were returned. (R.pp. 730-731). When the cultures were returned on or about February 10, 2012, Dr. Chu opined that Plaintiff had 1+ staph aureus. Since this was resistant to penicillin, Dr. Chu started Plaintiff on Bactrim. Dr. Chu also sent Plaintiff a prescription for Percocet, as Plaintiff advised that he had been taking Vicodin but that this was not adequately relieving his pain at that time. (R.p. 730). At a one week followup appointment on February 16, 2012, Plaintiff's sutures were removed and he was advised to followup the next Monday for a "wound check". (R.pp. 727-728).

On February 22, 2012 Plaintiff returned to the VA to reestablish mental health care after an almost two year hiatus.[6] Plaintiff arrived alone and was noted to be walking slowly with a bent metal cane. On presentation Plaintiff was pleasant and cooperative with a full range affect, his cognition was "grossly intact", and he had a "mildly dysphoric" mood.[7] Plaintiff was assigned a GAF score of 54,[8] and referred to Dr. John Jachna, who saw the Plaintiff on February 28, 2012 to

---

[6]This was now seven (7) months after Plaintiff alleges he had become disabled.

[7]It was also noted that, notwithstanding Plaintiff's previous self reports of no problems with alcohol and drug abuse, that he had at one point been thrown from the back of a pickup while holding a bed while intoxicated. (R.pp. 711-712).

[8]"Clinicians use a GAF [Global Assessment of Functioning] to rate the psychological, social, and occupational functioning of a patient." Morgan v. Commissioner of Soc. Sec. Admin., 169 F.3d 595,
(continued...)



develop a psychiatric treatment plan. Dr. Jachna noted that Plaintiff had a history of non-compliance as well as episodic alcohol abuse. Plaintiff reported continued mood issues with worsening related to his recent leg fracture and attendant complications. Dr. Jachna opined that Plaintiff's poor compliance record raised questions about the use of psychotropics requiring regular monitoring, and for the time being prescribed Plaintiff some Hydroxyzine. Under "occupational problems", it was noted that Plaintiff had "abruptly quit work last year, frustrated. Applying for disability". (R.pp. 420-422).

On March 8, 2012 Plaintiff was seen in the orthopedic clinic, where it was noted that Plaintiff had "been doing well post-op" and had been compliant with daily dressing changes. Plaintiff was observed to have an antalgic gait and he was using a cane. Plaintiff advised that his last episode of purulent drainage had been about a week ago, and denied any problems with his drainage line, reporting only minimal discomfort due to its presence only. On examination Plaintiff's leg wound was noted to be shallow with healthy appearing tissue. Plaintiff had no purulant drainage and only a small amount of serous drainage with no edema. (R.pp. 416-418).

Plaintiff was thereafter reevaluated by Dr. Richmond on March 15, 2012. Dr. Richmond noted that Plaintiff had developed celluitis from the pin-trac cites post-operatively, but that these had resolved well with oral antibiotics, and that while Plaintiff was still having some occasional soreness in the ankle and occasional mild swelling, that overall Plaintiff himself stated that he was "doing well". On examination Plaintiff's left ankle had ten degrees of dorsiflexion with

---

[8](...continued)
597 n.1 (9th Cir. 1999). A GAF of 51 to 60 indicates that only moderate symptoms are present. Perry v. Apfel, No. 99-4091, 2000 WL 1475852 at *4 (D.Kan. July 18, 2000); Matchie v. Apfel, 92 F.Supp.2d 1208, 1211 (D.Kan. 2000).



forty degrees of plantarflexion, there was no tenderness to palpation of the fracture cites and no pain throughout the arch of motion, and there were no signs of infection. Dr. Richmond opined that post-operatively Plaintiff was "stable", with the cellulitis in his left lower leg also being "stable". Plaintiff was advised to continue standing and walking activities and shoe wear as tolerated, with a recheck in five months. (R.p. 537).

On July 14, 2012 Plaintiff was seen in the emergency room by Dr. James Reese, where he had been brought by paramedics for a psychiatric evaluation. Plaintiff complained that he had been "anxious for weeks", but denied being suicidal. Plaintiff had apparently just moved and had been in a verbal argument with his wife. Plaintiff was noted to be alert and cooperative with a normal speech rate, he had normal neurological testing, and his extremities had no tenderness and no edema. Dr. Reese discussed Plaintiff's diagnosis and condition with him, following which Plaintiff was "feeling much better" with his symptoms "much improved". Plaintiff was advised to seek out-patient followup as needed, and was discharged in stable condition. (R.pp. 498-499). Plaintiff was also apparently seen at the VA clinic by Brittany Miller, a registered nurse, that same day (although it is not clear in the records whether this was a separate visit), who noted that Plaintiff had moderate "stressor[s]" while his mental status was oriented X4 with normal effect. Notably, on mobility testing Plaintiff was noted to have an independent, steady gait and that he was able to get up and down without assistance. (R.pp. 502-504).

On August 14, 2012, Plaintiff returned to see Dr. Richmond, at which time Plaintiff again advised that he had "no complaints". On examination Plaintiff was able to ambulate without a limp, his left ankle had ten degrees of dorsiflexion with forty degrees of plantarflexion, he had a good active eversion and inversion, there was no pain throughout the arch of motion and no tenderness to palpation, and neurovascularly he was intact distally. Plaintiff had some "mild" diffuse



swelling about the ankle and lower leg, but there was no eyrthema. X-rays were obtained which showed Plaintiff's mortise to be intact with no arthritic changes noted, all hardware was intact and in good position, and Plaintiff's fractures appeared to be completely healed. Dr. Richmond advised Plaintiff to continue standing and walking activities as tolerated. (R.p. 536).

      Plaintiff returned to see Dr. Jachna at the VA on August 23, 2012 for a psychiatric follow-up visit. Dr. Jachna noted that Plaintiff had come alone and was walking normally without a cane. Plaintiff told Dr. Jachna that he had been having trouble with his memory and "missing things", and about the incident where he had gone to the emergency room in July, when he had threatened to cut into his right forearm after he and his wife had had an argument. Plaintiff said he "wasn't thinking very clearly at the time". On examination Dr. Jachna found Plaintiff to be pleasant and cooperative with a full range affect, no suicidal ideation, "grossly intact" cognition, and with only a mildly dysphoric mood. Dr. Jachna recommended repeat psychological testing to help determine and clarify Plaintiff's memory complaints. (R.pp. 511-514). The record reflects that Plaintiff thereafter attended some psychotherapy sessions, together with his wife.

      When Plaintiff returned to see Dr. Richmond on November 13, 2012, he again had "no complaints". On examination Plaintiff was noted to ambulate without a limp, his other examination findings were essentially unchanged from his previous visit, he had no tenderness to palpation of the fibula or distal tibia, and he had normal sensation to light touch distally with good capillary refill. Dr. Richmond told Plaintiff he could engage in activities as tolerated. (R.p. 535).

      On November 15, 2012, Plaintiff was seen by Nurse Practitioner Mega at the VA for a "re-check/re-evaluation" of his complaints. Mega went over Plaintiff's lab results, and he was advised to stop smoking. Plaintiff denied to Mega that he had engaged in any attempts to harm or kill himself in the past year, and Mega wrote in the clinic notes that "no further action is required



unless clinically indicated". (R.pp. 572-575). However, notwithstanding this observation, in a Medical Assessment form (mental) completed the following month, on December 27, 2012, Mega opined that Plaintiff's mental impairments rendered him incapable of performing sustained work activity for eight hours a day, five days a week with normal breaks. Mega also opined that Plaintiff was at least moderately limited in most areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation, and was even markedly limited in numerous areas of these functional criteria.

Mega also completed a Medical Assessment form (physical) for the Plaintiff that same date, in which he opined that Plaintiff was not capable of performing sustained work activity for an eight hour work day, five days a week, that he had a lifting capacity for less than sedentary work,[9] that he could stand and/or walk (with normal breaks) during an eight hour work day for less than two hours, and sit for only about three hours, that he would regularly have to alternate standing and walking at will and would sometimes need to lie down at unpredictable intervals three to four times per day, that he could never stoop and crouch and only infrequently bend due to left ankle pain, that he could only infrequently push/pull with his upper extremity (because this would also increase his left ankle pain), and that these problems together with Plaintiff's depression, bipolar disorder, personality disorder, and anxiety would result in Plaintiff being absent from work more than four days a month. In addition to being signed by Nurse Practitioner Mega, both of these medical assessment forms were also signed by Dr. Minner as Mega's supervising physician. See generally,

---

[9] Sedentary work is defined as lifting no more than 10 pounds at a time and occasionally lifting and carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a) (2005).



(R.pp. 531-534).

On February 8, 2013, Plaintiff was seen at the VA by Dr. Lynda Cox for a cognitive-behavioral session. On presentation Plaintiff was noted to be in a "fairly cheerful mood", but with sometimes inappropriate affect due to reported anxiety. Plaintiff advised Dr. Cox that his functioning had changed significantly following his traumatic brain injury accident in 2001, that his memory was poor, his thinking was less clear, and that he felt his behavior was sometimes out of control. Dr. Cox recommended anger management. Plaintiff had a follow-up appointment with Dr. Cox on February 15, 2013. See generally, (R.pp. 566-569).

Plaintiff saw Dr. Jachna again on February 25, 2013 for a psychiatric follow-up visit. Dr. Jachna noted that this was the first time he had seen the Plaintiff since August 23, 2012. Dr. Jachna's notes reflect that Plaintiff reported having had one significant event since the last time he had seen him, but that otherwise "things [had] been going pretty well", although Plaintiff's TV had been stolen from his house by a neighbor. Dr. Jachna noted that Plaintiff had come alone to the appointment, that he was pleasant and cooperative with a full range affect, that he had had no recent suicidal or homicidal ideation, that he had a grossly intact cognition, and only a mildly dysphoric mood. Dr. Jachna felt therapy was best for the Plaintiff rather than trying to address his complaints via medication, and that Plaintiff might also benefit from marital counseling. (R.pp. 562-565). Plaintiff continued thereafter to be seen at more or less regular intevals by both Dr. Cox and Dr. Jachna through July 2013. See generally, (R.pp. 546-562, 650-653).

After review and consideration of this medical record and evidence in conjunction with the subjective evidence, the ALJ determined that Plaintiff's severe impairments of residuals of lower extremity fractures, depressive disorder, personality disorder, anxiety disorder, and impulse control disorder, as well as obesity and asthma, although not disabling, would nonetheless restrict



17

Plaintiff to the performance of medium level work with the ability to stand/walk for six of eight hours and sit for six of eight hours in a work day; further limited to only frequently pushing/pulling with the left lower extremity, climbing ramps/stairs, climbing, balancing, stooping, kneeling, crouching or crawling; never climbing ladders/ropes/scaffolds; avoidance of concentrated exposure to fumes, odors, dust, gases and unventilated areas; never working around hazards; and further limited to work involving only simple one-step and two-step instructions, defined as low stress, non-production work with no fast-paced work and no contact with the public.  (R.p. 39).

## II.

### (Treating Physician Opinion)

Plaintiff argues that in reaching his decision that Plaintiff is not disabled and could perform the work activities as set forth in the RFC finding, the ALJ improperly considered and evaluated the opinions of Plaintiff's "treating physician and nurse practitioner", Dr. Minner and Mr. Mega.  As noted, in their Medical Assessment forms of December 27, 2012, Mega and Minner opined that Plaintiff's condition and impairments rendered him unemployable, a conclusion that Plaintiff believes should be controlling in this case.  See Craig v. Chater, 76 F.3d 585, 589-590 (4th Cir. 1996) [Noting importance of treating physician opinion].  However, the ALJ gave Dr. Minner's and Mr. Mega's[10] opinions "little weight", concluding that Plaintiff's medical record did not support these opinions, which were inconsistent with the other substantial evidence in the record, including the evidence from the VA, where these two individuals worked.  (R.pp. 45-48).  See Craig, 76 F.3d at 589-590 [rejection of treating physician's opinion of disability justified where the treating physician's opinion was inconsistent with substantial evidence of record].  After a careful review of

---

[10]Misspelled "Jega" in the opinion.



the record and decision in this case, the undersigned can find no reversible error in the ALJ's treatment of these opinions. Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002) ["[W]hen a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight" (citations omitted) ]; see also Hays, 907 F.2d at 1456 [It is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence].

First, the ALJ correctly noted that with respect to statements or conclusions by medical professionals that a claimant is "disabled" or "unable to work", this is an administrative finding and is therefore a determination reserved to the Commissioner. (R.p. 47); see Castellano v. Secretary of Health & Human Servs., 26 F.3d 1027, 1029 (10th Cir. 1994) [physician opinion that a claimant is totally disabled "is not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]"]; 20 C.F.R. § 404.1527(d) ["a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled"]. The ALJ further correctly noted that in this case there was minimal evidence that Dr. Minner even had a treating relationship with the Plaintiff, or that she had treated the Plaintiff for the specific impairments which were referred to in the medical form signed by her and Mega. Therefore, it was unclear whether she would even be entitled to be considered a "treating source" whose opinion would be entitled to great weight under 20 C.F.R. § 404.1502 and 416.902. As for Mega, the ALJ correctly pointed out that a nurse practitioner is not an acceptable medical source, and that Mega's opinion was therefore also not entitled to controlling weight. (R.p. 47). See Brewer v. Astrue, No. 11-105, 2011 WL 5553700 at * 4 (E.D.Ky. Nov. 15, 2011)[Nurse practitioner is not an acceptable medical source under the regulations.]; Taylor v. Commissioner, No. 07-1023, 2008 WL 2776481 (M.D.Fla. July 15, 2008)[same]; Patton v. Astrue, No. 10-135, 2012 WL 645880 at * 7 (M.D.Ga. Feb. 6, 2012)[ALJ not required to give significant weight to "other



19

source" opinions.].

Even so, the ALJ nonetheless proceeded to consider the medical opinions set forth by Minner and Mega in the cited medical source statements under SSR 96-2p and in conjunction with the other evidence of record. In finding that these opinions were entitled to "little weight", the ALJ noted the contradictory medical evidence relating to Plaintiff's physical capacity from other treating and examining sources showing that he had good lower extremity strength, normal sensation, an independent gait and had ceased using a cane, that he regularly attended appointments alone and had the ability to drive, along with Plaintiff's mental health records including his GAF scores, the results of his mental status examinations, as well as the findings of consulting physicians Ginsberg and Phillips. (R.p. 48). These records provide substantial evidence to support the ALJ's determination to give little weight to Minner and Mega's December 2012 assessments. <u>See generally</u>, (R.pp. 377-379, 395-398, 420-422, 486-487, 502-504, 535-538, 562-565, 776-778). <u>Cf.</u> <u>Craig</u>, 76 F.3d at 589-590 [noting importance of treating physician opinions]; <u>Richardson v. Perales</u>, 402 U.S. 389, 408 (1971) [assessment of examining, non-treating physicians may constitute substantial evidence in support of a finding of non-disability].

The ALJ noted that Dr. Minner's opinion from the December 2012 physical and mental RFC assessments was inconsistent with and contrary to the records of Dr. Jachna and Dr. Richmond, which differ substantially from the degree of limitation claimed by Plaintiff in his testimony as well as was set forth by Dr. Minner (and Mega) in their findings. (R.pp. 42-42, 47). There is no question but that Dr. Richmond and Dr. Jachna were both treating physicians. <u>See Craig</u>, 76 F.3d at 589-590 [noting importance of treating physician opinions]. Additionally, it was also noted that Plaintiff had worked for a long time with the affects of his injury from 2001, and the ALJ determined that the findings of Dr. Phillips and Dr. Ginsberg that Plaintiff should be able to focus



during and complete simple tasks, and that Plaintiff had only a mild impairment of working memory, were consistent with a finding that Plaintiff could perform work tasks with simple instructions and no contact with the public, and were given significant weight. (R.p. 48); Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993) [ALJ may properly give significant weight to an assessment of an examining physician]; see also Foster v. Bowen, 853 F.2d 483, 489 (6th Cir. 1988)[A mental impairment diagnosis is insufficient, standing alone, to establish entitlement to benefits.]; cf. Orrick, 966 F.2d at 370 [absent showing of significant worsening of condition, ability to work with impairment detracts from finding of disability].

Finally, the ALJ's discounting of the Minner and Mega opinions is also supported by the opinions of the state agency physicians, both of whom opined that Plaintiff could perform the range of work as reflected in the RFC findings in the decision. The ALJ determined that these opinions were entitled to significant weight insofar as they showed that Plaintiff is capable of performing medium exertion, citing to the evidence showing that Plaintiff had fully recovered from his lower extremity surgeries, as well as with respect to the enviormental limitations assigned by the state agency physicians. (R.pp. 49-50); see Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986) [Opinion of non-examining physicians can constitute substantial evidence to support the decision of the Commissioner]; see also Johnson v. Barnhart, 434 F.3d 650, 655-656 (4th Cir. 2005) [ALJ can give significant weight to opinion of medical expert who has thoroughly reviewed the record]; Stanley v. Barnhart, 116 F. App'x 427, 429 (4th Cir. 2004)[disagreeing with argument that ALJ improperly gave more weight to RFC assessments of non-examining state agency physicians over those of examining physicians]; 20 C.F.R. §§ 404.1527(e); SSR 96-6p, 1996 WL 374180, at *1 (July 2, 1996) ["Findings of fact made by State agency ... [physicians ]... regarding the nature and severity of an individual's impairments must be treated as expert opinion of non-examining sources at the

21



[ALJ] and Appeals Council level of administrative review."]. The ALJ even gave Plaintiff every benefit of the doubt by assigning little weight to the state agency physician findings as to Plaintiff's ability to push or pull with his lower extremities due to the combined effects of his history of lower extremity fractures. (R.p. 50). This finding was consistent with the overall evidence of record, and was a proper exercise of the ALJ's role as fact-finder in the case. See Marquez v. Astrue, No. 08-206, 2009 WL 3063106 at * 4 (C.D.Cal. Sept. 21, 2006)[No error where ALJ's RFC finding was even more restrictive than the exertional levels suggested by the State Agency examiner]; cf. Muir v. Astrue, No. 07-727, 2009 WL 799459, at * 6 (M.D.Fla. Mar. 24, 2009)[No error where ALJ gave Plaintiff even a more restrictive RFC than the medical records provided].

In sum, after careful review of the record, the undersigned can find no reversible error in the ALJ's treatment of the opinions of Dr. Minner and NP Mega as set forth in their medical source statements of December 2012. The ALJ properly discounted these opinions because they were not supported by either the VA's own treatment records or the evidence as a whole. The ALJ determined that the substantial medical evidence in the case record showed that Plaintiff can attend to and perform simple tasks without special supervision for at least two hour periods, and that his symptoms would not interfere with satisfactory completion of a normal workday or work week or require an unreasonable number or cooling off periods. He further found that the evidence supported a finding that Plaintiff would be able to follow basic instructions from supervisors, could change appropriately in response to feedback from supervisors, and that his moderate difficulty with social functioning and with concentration, persistence and pace would not interfere with his ability to meet the demands of unskilled work, defined as low stress, non-production work with no fast-paced work



and with no contact with the public.[11]  Again, the record in this case (discussed, <u>supra</u>) provides substantial evidence to support these findings.  <u>See</u> <u>Trenary v. Bowen</u>, 898 F.2d 1361, 1364 (8th Cir. 1990) [Courts should properly focus not on a claimant's diagnosis, but on the claimant's actual functional limitations]; <u>Carlson v. Shalala</u>, 999 F.2d 180, 181 (7th Cir. 1993) [". . .What we require is that the ALJ sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.'"]; <u>see also</u> <u>Hepp</u>, 511 F.3d 798, 806 (8th cir. 2008)[Noting that the substantial evidence standard is "less demanding than the preponderance of the evidence standard"].

This Court may not overturn a decision that is supported by substantial evidence just because the record may contain conflicting evidence.  <u>Smith v. Chater</u>, 99 F.3d 635, 638 (4th Cir. 1996) ["The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court"].  <u>Kellough v. Heckler</u>, 785 F.2d 1147, 1149 (4th Cir. 1986) ["If the Secretary's dispositive factual findings are supported by substantial evidence, they must be affirmed, even in cases where contrary findings of an ALJ might also be so supported."] (citation omitted)].  Here, the ALJ properly considered and analyzed Minner's and Mega's opinions in conjunction with the evidence as a whole, and the decision does not reflect a failure by the ALJ to properly consider the record and evidence in this case.  <u>Bowen</u>, 482 U.S. at 146, n. 5 [Plaintiff has the burden to show that he has a disabling impairment]; <u>see also</u> <u>Guthrie v. Astrue</u>, No. 10-858, 2011 WL 7583572, at * 3 (S.D.Ohio Nov. 15, 2011), <u>adopted by</u>, 2012 WL 9991555 (S.D.Ohio Mar. 22, 2012)[Even where substantial evidence may exist to support a contrary conclusion, "[s]o long as substantial evidence exists to support the Commissioner's decision . . . this Court must affirm."]; <u>Mickles v. Shalala</u>, 29 F.3d 918,

---

[11]In making these findings, the ALJ complied with the requirements of <u>Mascio v. Colvin</u>, 780 F.3d 632 (4th Cir. 2015); <u>see</u> <u>generally</u>, (R.pp. 40-44).



925-926 (4th Cir. 1994)[In assessing the credibility of the severity of reported subjective complaints, consideration must be given to the entire record, including the objective and subjective evidence]. Therefore, Plaintiff's argument that the decision in this case should be reversed due to an improper evaluation of this evidence is without merit.

### Conclusion

Substantial evidence is defined as " ... evidence which a reasoning mind would accept as sufficient to support a particular conclusion." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). As previously noted, if the record contains substantial evidence to support the decision (i.e., if there is sufficient evidence to justify a refusal to direct a verdict were the case before a jury), this Court is required to uphold the decision, even should the Court disagree with the decision. Blalock, 483 F.2d at 775.

Under this standard, the record contains substantial evidence to support the conclusion of the Commissioner that the Plaintiff was not disabled within the meaning of the Social Security Act during the relevant time period. Therefore, it is recommended that the decision of the Commissioner be **affirmed**.

The parties are referred to the notice page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

December 11, 2015
Charleston, South Carolina



24

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

